## Bailey v. Commonwealth.

(Decided February 10, 1922.)

### Appeal from Rockcastle Circuit Court.

1. Criminal Law—Evidence –Argument of Counsel.—Upon his trial under an indictment for murder appellant was convicted and his punishment fixed at confinement in the penitentiary for life. He appeals complaining of incompetent evidence introduced; of improper argument by the Commonwealth's attorney, and error in selecting the jury. The complained of evidence and the alleged improper remarks of the prosecuting attorney are set out in the opinion and it is held that neither of them is sufficiently erroneous, if erroneous at all, to authorize a reversal of the judgment.

2. Criminal Law—Argument of Counsel.—Argument of counsel which addresses itself to the degree of punishment which should be inflicted cannot be prejudicial when the jury was not influenced thereby but returned a lesser punishment that the one insisted on.

3. Criminal Law—Review of Errors in Empanneling Jury—This court, under the provisions of sections 280 and 281 of the Criminal Code, can not review alleged errors in the empanneling of the jury, since there exists no right of appeal from the decision of the trial court on such matters.

HIRAM H. OWENS, C. C. WILLIAMS, CAM MULLINS and R. N. JARVIS for appellant.

CHAS. I. DAWSON, Attorney General, and THOS. B. McGREGOR, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY JUDGE THOMAS—Affirming.

The appellant, John Bailey, was tried in the Rockcastle circuit court under an indictment found and returned against him by the grand jury of Knox county in which

he was charged with murdering, in the latter county, Beverly C. White. The killing occurred on April 8, 1921, at a small station called Heidrich, about three-fourths of a mile from Barbourville, and where the Cumberland and Manchester Railroad, running from Manchester, in Clay county, connects with one of the main lines of the Louisville & Nashville Railroad. The venue was changed from Knox county to Rockcastle county, and at the trial the jury convicted the defendant and fixed his punishment at a life term in the penitentiary. His motion for a new trial was overruled and judgment was pronounced on the verdict, and by this appeal he seeks a reversal upon three grounds, which are: (1) Incompetent testimony introduced by the Commonwealth over his objection, (2), prejudicial misconduct of the Commonwealth's attorney in his closing argument to the jury, and (3) error of the court in selecting the jury to try the case. There is no complaint about instructions which the court gave or refused to give to the jury, nor is the sufficiency of the testimony to support the verdict questioned, and in disposing of the grounds relied on for a reversal of the judgment we will make reference to only such portions of the testimony as we deem necessary to an understanding of the matters discussed.

Under ground 1, it is seriously contended that portions of the testimony of Luther Hatton and B. P. Walker, both of whom were introduced by the Commonwealth, are greatly prejudicial to the substantial rights of the defendant, and counsel insists, with great emphasis and seeming confidence, that the complained of testimony is of such a nature as compels this court, under rules of criminal practice, to reverse the judgment. Taking up first the complained of testimony of the witness, Hatton, the record discloses that the deceased, on a late afternoon train the day before he was killed, went to Manchester on a business mission, and on that train was James Bailey, the brother of the defendant, who did not testify in the case, but, according to the testimony of defendant, his brother came on that train to Fount, the home of their father, where defendant was living, to pay the family a visit, but he tarried but a short while and went back on the next southbound train towards Barbourville to a station called Girdler, where he spent the night and returned the next morning in time to catch the same train back to Barbourville upon which deceased was ex-

pected to and did return from Manchester. Defendant, his brother and their father boarded that train together with some of their friends when it arrived at Fount, and, according to the testimony, defendant between that point and Heidrich, where the killing occurred, made several trips through the train, including what is commonly known as the "ladies' coach" in which deceased was riding seated near the rear end of it. The witness, Hatton, was also in that coach and engaged the deceased in conversation, and the portion of his testimony complained of relates to what occurred just before arriving at Heidrich. Some of it, as copied in the record and complained of in brief, was not excepted to, and other portions of it the court excluded from the consideration of the jury. The whole of the complained of testimony of the witness Hatton related to an effort on the part of the Commonwealth to show why the witness and the deceased remained in the car till all of the passengers had alighted and then got off at the rear end of it. The Commonwealth was endeavoring to have the witness state whether White suggested such a course but in each instance the court sustained the objection to the questions and at one time when the witness answered before the objection was acted upon the court promptly admonished the jury not to consider it. But the witness was permitted to say, "I went out that way because Mr. White went out that way," and further, that he had stated to deceased just before arriving at the station that "it looks like a pretty bad situation, Bev," and that he (witness) didn't know "whether they (the Baileys) like me very well or not," and after that the two decided to and did leave the train at the rear end. The above is the substance of all the testimony given by the witness, Hatton, complained of on this appeal, to which exceptions were taken and which the court admitted over defendant's objections. It will be observed that no statement of the deceased was allowed to be introduced and the testimony as a whole was but explanatory of conduct which might otherwise be clothed with suspicion. It related only to a collateral circumstance which occurred some time before the killing, and in reality was as much calculated to benefit the defendant as the prosecution, since its effect was to show that deceased was aroused and became suspicious of the defendant, and perhaps his associates on the train, particularly his brother and father, and because thereof con-

cluded to prepare to do them harm.  So that, if we should hold that the testimony was technically erroneous it could not convincingly be insisted, in the light of the entire testimony, that is was sufficiently prejudicial to authorize a reversal of the judgment.

The witness, Walker, was the sheriff of Knox county and saw the body of the deceased shortly after he was killed and observed his clothing as well as his body and the bullet holes made therein.  On the witness stand he was permitted to explain the location of the wounds in the body and to take the clothing and compare the holes therein with the wounds in the body.  Incidentally he stated that "one bullet went in here and came out there," etc., but in most, if not all, instances he explained the reasons for his statement as to the direction the shots were fired and gave the facts upon which his statements were based to-wit: the clothing with the holes therein, was exhibited to the jury for their inspection.  Under the circumstances the opinion of the witness as to the points of entrance and exit of the various shots fired into the body of the deceased could not possibly have influenced the jury prejudicially against appellant, for they had before them the very facts upon which the opinion of the witness was based, and which opinion corresponded with all the testimony of all the eyewitnesses to the shooting except that of defendant.  If we should concede (but which we do not determine either way) that the testimony was technically erroneous we would still feel unauthorized to reverse the judgment therefor in the light of all the proven facts and circumstances in the case.  As illustrating the absence of merit in the argument it may be stated that one of the chief questions propounded to the witness and of which the strongest complaint is made was number 100, and it is in this language: "Now, then, will you take the clothing there and point out the holes, if there are any there that correspond with the wounds on the body, lower down on the body, here in front?"  Witness did as the question requested and pointed out certain holes in the outer garments which corresponded with the ones in the underclothing worn by deceased, and in doing so he used such expressions as "It goes through, and then through the undershirt and the first thing it hit was the top shirt and makes these places here," etc.  The court, upon objection to the answer, promptly sustained it and thereby cured any prejudicial effect, if any, which

it may have produced on the minds of the jury. Upon the whole we regard the complaint made about the testimony of this witness as extremely technical and wholly insufficient under the provisions of section 271 of the Criminal Code, as repeatedly construed by this court, to authorize the granting of a new trial.

The complained of argument of the Commonwealth attorney under ground 2, as shown by the bill of exceptions, consists of two statements made by him, which are: (a) "If every man guilty of murder in Knox county and who has been tried for that crime in the last ten years had been convicted and given the punishment he deserved, in my opinion this case would not be here today," and (b), "Gentlemen of the jury, it is up to you to enforce the law. The judge upon the bench, the Commonwealth's attorney, and the sheriff may do their duty, and yet if the juries who try the cases do not come up to the full measure of their duties, then crime will run rampant in this country. You know that crime is on the increase, and it will be so throughout all time, unless ample punishment is given to those who violate the laws of the land. This is all current history of this state, and it is also current history of this state that its Governor recently issued an appeal to the people of the state to take the necessary measures to suppress crime. This defendant has been shown by the evidence to be guilty of the crime with which he is charged, and a verdict of yours which fails to send him to the electric chair, in my judgment, will not be the kind of a verdict that should be rendered under the facts in this case." The court sustained an objection to statement (a), and admonished the jury not to consider it in making up their verdict, but he overruled the objection to statement (b), and the only question presented under this ground is whether that statement was sufficiently prejudicial to authorize a reversal.

This court, as well as many others whose opinions are cited in briefs has frequently said in substance that the duty of a prosecuting attorney is not to persecute but to prosecute, and that he should endeavor to protect the innocent as well as to prosecute the guilty. He should always be interested in seeing that the truth and the right shall prevail, and to this end he should not travel outside of the record or discuss matters not presented therein for the purpose of inducing a conviction, since he is not a witness and is only authorized to discuss the proven

facts and circumstances and array them in such fashion as comports with legitimate deduction. On the other hand, it has been as frequently held that it is not error for the prosecuting attorney to urge upon the jury the necessity of the enforcement of the law and to inflict such punishment, if the jury should conclude from the evidence to convict the accused, as the enormity of the crime deserved, as well as for its deterring effect upon others and thereby encourage a disposition in them to observe the laws of the country. When analyzed the complained of statement (b), does not violate that privilege; it contains no appeal to the jury to convict the appellant because of any of the matters therein contained, but says to them, in substance, that crime will increase "unless ample punishment is given *those who violate the laws of the land*," and then adds that the defendant "has been · shown by the evidence to be guilty of the crime with which he is charged," followed by an admonishment to the jury that in the estimation of the attorney the only fitting punishment for the crime was electrocution.

The statement about the appeal of the Governor of the Commonwealth for the enforcement of the laws is plainly but another reason why the attorney thought that the death penalty should be inflicted rather than life imprisonment. Since, therefore, the statement was primarily directed toward the punishment which the jury should inflict and not to his guilt or innocence of all crime, and the jury inflicted the milder punishment, we are unable to see wherein appellant can complain. This court has denounced improper conduct of prosecuting attorneys as forcefully and with as much consistency, perhaps, as any other court and we are still as much opposed as ever to approving any argument or conduct by them which transgresses the limitations of proper license, but that rule does not require that the prosecuting attorney shall withhold from the jury his views touching the extent of the punishment which he in good faith believes the enormity of the crime merits.

Upon the day in question the train arrived at Heidrich at about 10:30 a. m., and the killing occurred within an hour thereafter. To the north of the depot was a restaurant which was owned by a cousin of appellant and he was in it on that day. Defendant, according to his testimony, made the trip to Barbourville on that particular day for the purpose of seeing an attorney on a question

of business and to be with his brother James. His father, brother and other companions who accompanied him, when they alighted from the train were conveyed in taxicabs to Barbourville, but appellant instead of going with them or in another taxicab went to the restaurant, as he says, for the purpose of informing his cousin that he would pay him some time during the day a balance of $6.00 on an indebtedness of $20.00. While there he saw deceased and Hatton, who were taking some kind of cold drink in the restaurant, and he and his cousin went into a little compartment at the end of the counter, which had been made for a post office, and had a whispered conversation. He then went out, as he says, for the purpose of going up to Barbourville, but all the conveyances had left. Though the distance was less than a mile it did not occur to him to walk. After speaking to the railroad agent he went back to the restaurant and again had a conversation with his cousin and arranged to go with him to a nearby boarding house for dinner although it was not then as late as 11:30. The cousin thereupon announced to those in the house that he intended to close the restaurant and go to dinner and they immediately went out. The deceased and another were sitting upon some empty soda pop cases about ten feet from the door, and appellant's cousin went to the door and announced to them his intention to close the restaurant and for them to get their grips which had been deposited near the door. The deceased, according to the great preponderance of the evidence, had his overcoat on his right arm and he walked to the door of the restaurant and reached in with his left hand for his grip when defendant began shooting him and inflicted several wounds upon his body, from which he immediately died.

Aside from the testimony of about five eye-witnesses, in substance as above indicated, there are four proven circumstances strongly supporting that testimony and which was not denied by any one except defendant. The first one is the suspicious conduct of James Bailey who did not testify at the trial and who was living at the time in Harlan county, but he went to his father's home on the evening before the killing next morning on the same train traveled by the deceased to Manchester. The visit, as we have seen, was ostensibly a social one but the visitor did not remain with his father's family for the night but boarded a returning train shortly thereafter and got off at

an intervening station between that point and Barbourville where he spent the night and returned to his father's home on an early morning train in time for himself, his brother (the appellant), his father, and other companions to return to Barbourville on the same train which deceased was on. To say the least of it this conduct suspiciously points to the fact that the three Baileys knew that deceased would be on the train and they conveniently selected it as the one upon which to make the trip to Barbourville. Secondly, the fact that appellant, instead of going to Barbourville immediately upon alighting from the train, remained around the depot and the restaurant after having seen that the deceased was also there (waiting for an outgoing train), and he was able to give no better excuse for doing so than to inform his cousin that he expected to pay him a balance of $6.00 some time during the day. Third, the fact that he secretly conversed with his cousin about the alleged indebtedness in a separate apartment of the restaurant, and fourth, that immediately thereafter he concluded to not go to Barbourville before eating a very early lunch, and in preparation therefor his cousin ordered those in the house to vacate it and immediately invited the deceased to come to the restaurant for the purpose of getting his grip. Neither of these four circumstances comport with the usual and ordinary course of conduct, and, as we have stated, strongly support the theory of a preconcerted arrangement to create a favorable opportunity for the killing when no one was immediately present and at a time when it would be attended with the least danger to the assailant.

Under the circumstances there was abundant testimony to support the verdict of the jury and we feel that we would be but trifling with justice if we were to reverse the judgment for any of the alleged errors heretofore considered, even were we to concede them to be such, since in no view of the case can it be concluded that they, or any of them, prejudicially affected the rights of appellant.

Ground 3, urged for a reversal, has often been presented to this court and as often denied, because under the provision of section 280 and 281 of the Criminal Code questions concerning the formation of the jury are not reviewable on appeal. The latest case upon this point is McLaughlin v. Commonwealth, 192 Ky. 206, in which it is pointed out that a defendant in a criminal trial has

no vested right to an appeal, and if it is withheld by statute in the absence of a constitutional provision preventing it, the defendant cannot complain. If, therefore, we were of the opinion (which we are not) that the court erred in the method adopted in selecting the jury that tried appellant, we are without authority to review it.

After a thorough consideration of the whole record we are forced to the conclusion that none of the grounds urged are sufficient to authorize a reversal of the judgment and it is, therefore, affirmed.